Our fifth case for this morning is Reed v. Neal. Mr. Magrisso. May it please the court, my name is John Magrisso. I represent the appellant in this matter. I'd suggest we are here because the lower courts unreasonably determined the facts and lie the evidence presented in the state court proceedings. That being that Mr. Smith did in fact receive ineffective assistance of counsel when his trial attorney failed to first investigate a number of witnesses who Mr. Smith had made his counsel aware of prior to trial and, after failing to investigate them, failing to put them on at trial. Those witnesses were both corroborated the trial testimony that Mr. Smith gave as well as, at least in one case, challenged the testimony of the complainant. That witness specifically is Ms. Ruby Matusak. So here's my issue with your position. Even looking at the evidence that you set forth that these potential witnesses who didn't testify would have presented, it would have shown that Mr. Smith was not in the house and actually would have accounted for a lot of his time, but the victim's account also has him not in the house for much of that time and I don't see anything in your account of this that would explain what she looked like when the passing motorist picks her up and she's got ropes and she's got contusions and she's hysterical. I mean, I just don't see where that evidence is even touched. As to that evidence, as to Ms.'s appearance when this motorist, Mr. Metz, passes by, we respectfully don't have an explanation for how she received those injuries or was found outside the house and we're not suggesting, though, that Mr. Smith is the person that inflicted those on her. But you have no explanation. I mean, obviously her explanation is what it was and that's what the jury bought, but I'm having trouble seeing how these additional witnesses, I'll just call them that, to stay away from whether they're alibi or impeachment or whatever they are, but it's hard for me to see how they really change the texture of the state's case. When the state has her account, the state has the motorist's account, they've got the pictures of how she's injured, he realizes that somehow or another a sexual encounter is part of this story, whether according to him it's an earlier consensual one or according to her it's the rapes. Somehow or another there is that, so we know that. I don't know how this really changes, though, what happens. If I may, the way we suggest it does in fact impact what happens is both you do have witnesses that challenge, or at least one witness of Mr. Smith's that challenges some of the facts testified to by the complaining witness. Again, I go back to Ms. Matusak who said that in the post-conviction testimony that she had observed MS and her boyfriend entering Mr. Smith's home on prior occasions, at least once or twice, Ms. MS testified that she'd never previously been in the home. The jury submitted questions that are in the petitioner's appellant asking do you have anything to support, asking whether Mr. Smith has anything to support his statement of he was at certain places at certain times. They did not, and Mr. Smith did, but those witnesses were not put before the jury. The jury, I suggest, was obviously weighing the credibility of both Mr. Smith and what he testified happened and the credibility of MS, and with nothing to corroborate Mr. Smith's testimony, they ended up determining that MS was present. But that's a peripheral point, isn't it? Whether she and her boyfriend went into the house on some other occasion. I mean, she's talking about this occasion, the courts, the Indiana courts, conclude that the assault is finished by 1.30 in the afternoon, so all the rest of the stuff about where Smith went or didn't go is all post-assault anyway. I suggest, respectfully, it's now a peripheral point to go see the credibility of the witness on the stand before the jury, whether she can and should be believed by the fact finders at trial. That's not peripheral. That's the heart of the case. It's a he said, she said case at base, and the fact that there were witnesses to support, to corroborate what Mr. Smith said he was doing at different times, and they were not presented for the jury to hear, absolutely, respectfully, absolutely prejudiced Mr. Smith in his ability to mount a constitutional defense in this case. What about the DNA test? Again, as to that, Mr. Smith throughout did not challenge that he did have sexual intercourse with the complainant, so I'd suggest the DNA is a nullity in this case. It's not a question of was there or was there not sexual intercourse. Was that consensual sexual intercourse or not? But that pretty much dictated the defense, didn't it? I would suggest not. I mean, this has sort of been, and I believe we addressed this in the brief, one of the issues throughout, just because Mr. Smith says he had consensual sex with the complainant, that does not mean he cannot present the defense that he was elsewhere. Again, it goes to is Mr. Smith honest and credible in saying that this sex was consensual, or is the complainant when she says it was nonconsensual? I suggest it doesn't dictate the defense. It, again, follows from at least the trial stage as far as looking at the record exactly what my client, what Mr. Smith has said throughout, that this was a consensual sexual encounter. But there was some confusion, and the State picks up on this in their brief, about the purpose for these witnesses. And when counsel withdraws what he's calling the alibi defense, an alibi is something that says, you know, I was doing something else at the time of the crime, and there is no alibi. You have said, no, this isn't really an alibi defense. It's really more in the nature of impeachment. But I'm concerned that no one ever said to the State Court, we concede the sex, you know, here's the DNA evidence, and what we're really saying is, she says the events of the afternoon unfold in a certain way, and he has a way of impeaching her account of that. And, you know, the State courts are entitled to hear what the essence of the legal argument is. I'm not sure they did. I agree in that regard. I don't think that trial counsel, again, did his job. But even here, I mean, you know, it's not really an alibi problem. Correct. But that's what was raised through the State courts. That's correct. So the question is, how is this argument preserved? I'd suggest, as we said in our reply brief, the substance of the argument that these witnesses corroborate what the petitioner, what the defendant, what the appellant, what Mr. Smith has said, and challenge the veracity of the complainant has been the same argument throughout. And that, I apologize, I forget the case name, but that the case law says as long as the substance of the argument does not change, that the terminology used, particularly where this is a pro se petition, can be excused. And so I'd suggest that is exactly how we answer that issue. And I'd also suggest on that one point, if you look at, if the court looks at the record of the cross-examination of the complainant by counsel, what counsel is cross-examining her on is her credibility. He asks about testimony she gives on the stand as to the reviewing of the child custody file, the smoking of the cigarette, and the tampon, and says, and then goes back to her statement to the police in which she does not mention those things. That is specifically going to are you being honest, now, here, before Fifth Jury or not. Right, and he has a chance to do that. And that has been the trial strategy throughout. And these witnesses would have simply gone along with that strategy if he had bothered to actually speak with them, learn what they had to say, and put them on. I see my time is almost up. Okay, yeah, you're about out of time, so you'll have to sit down. I'll try to give you a tiny bit afterwards. Ms. Miklos. May it please the Court. The evidence that Smith faults his trial counsel for not presenting does not provide him an alibi and does not serve to impeach the victim's testimony on any point. Regardless how Smith packages his claim, he has failed to demonstrate that the Indian Accords unreasonably found that trial counsel was effective, that trial counsel lodged a reasonable investigation, and after doing so made a reasonable strategic decision to present a defense of consent and forego that of an alibi. Trial counsel's decision was reasonable for a number of reasons. One was after the DNA results came back showing defendant's DNA was found in a vaginal swab and a swab of her tampon, he felt that any of these witnesses that would have been presented did not go to the discrete question, which was where there was consent. Well, they don't go to the question. Right, so he concedes there's sex. I guess what he's trying to say is that she gives a fairly elaborate account of what goes on inside the house, and he's trying to say you've been inconsistent with your stories, hear other people to say that different things would have happened, he couldn't have been there at times, that you say he was there. So it's not so much the sexual encounter that he's trying to impeach as the rest of her story. But I think it goes to the reasonableness of the strategy, which was to go with what counsel believed was the strongest defense, which was the consent, and to not add on alternate theories or other possibilities of a defense, but to concentrate on really the one, the best defense that trial counsel believed that he had, which was consent. Second of all, I've heard a number of reasons how these witnesses should have been used, but what was presented to the state court and what was presented to the district court was that these were alibi witnesses. But even if we treat them as impeachment, they don't even impeach the victim's testimony. And, in fact, Smith's own testimony doesn't impeach those crucial time periods that he was with her. And, in fact, he gives an account of being with her an hour and 15 minutes, which was much longer than what the witness was able to testify to. But thirdly... So this is about 1230 to 130 or so? This was about approximately 1245 to 130, and then a little bit after 135, probably about 10 to 15 minutes after 135. And, in fact, the testimony from the post-conviction witnesses would have corroborated the victim's timeline on three main points. One is that she says, at some point, he leaves me for less than five minutes, and he comes back, and I hear his son in the home. That would correspond with Ruby, the neighbor, who lives two doors down, saying, at 130, he stayed less than five minutes and picked up his son, who was playing with my son. The third, or I'm sorry, the second... Couldn't the son... Was the son... The son was one of the witnesses, though, who's not called. Correct. And I thought his theory was that the son could have called some of this into question. The... Was he over in the house? Kevin Smith, Jr., I believe, is the son's name. His testimony in post-conviction is very vague. He says, I remember I was seven. I remember going to Burger King. I went to my grandparents' house. We went to another residence. It was very vague, and it didn't give any time periods. And that's my recollection of his complete testimony of post-conviction. Was there any conversation about playing with the neighbor kid earlier? That's what you understand, that while this was all going on, supposedly he was playing with the neighbor kid. Correct. I cannot remember if he spoke to that specifically, but that's never been an issue. The victim herself testified that she saw him playing outside of the house and that he was not in the house during the actual attack and the rape. But he also made a long trip to Virginia just on the spur of the moment. Well, he did once he learned that the police officers, which I think adds to... No, that's what Smith said, but the son was with him. Yes, the son was with him. Yes, he took the son. Didn't have any clothes, didn't have anything, didn't pack up to go. Correct. Once he learned that the police were at his home, he absconded to Virginia with his son. I'm just looking at the son not testifying, that's all. And the son could have lent some more information as to possibly what happened when they went to Virginia, but that would only bolster how these witnesses would only serve to hurt Smith's case and not help his case. The other point was that she testified that when Smith put duct tape over her mouth that he said to her, I'm going to leave and I'm going to go and get some money and find a car. And that's exactly what his witnesses testified to, that he was looking for a check at his parents' house, that he was asking his friend to cash his Social Security check to get money, and he had done some automotive work and he was looking to find the person who he had worked on the car for and swap cars. So that would have also corroborated what the victim said the defendant told her once he left. And then the third point is when the victim was finally able to release herself from the ties from the bed, that when she left, he was not there. He was not in the house. He was nowhere to be seen. And that's when she made the decision to run from the house. Had she managed to get her clothes back on by that time? I was a little confused as to what clothing she actually had on. Because he makes her shower at some point. He does make her shower at some point, and I don't believe the record is very clear as to what she was able to do or not. But I think the important part, which speaks also to the lack of prejudice here, is that once she escaped from Smith's home, she was able to flag down John Mertz, a passing motorist, who testifies and corroborates her account that she had just gone through a very traumatic event. She was bound at the wrists with rope. She was carrying a bulk of rope and was also bound at her ankles. There were already injuries that he could see. She was hysterical. This is not consistent with a woman who just had consensual sex with somebody. This was consistent with a woman who just had trauma. Even if you do find that counsel was deficient, there is no prejudice to be had. We assume when Mr. I think his name is Mertz or something like that, the person that finally started to pick her up, she was bound? Correct. Obviously she had to have been able to get dressed before she was bound. I would have to assume that. I would have to assume that too, Your Honor. Again, it wasn't clear from my reading. I think the state was trying to help her as far as the sequence of events, and that was just one aspect of it that was not very clear when she was able to get her top on. If there are no further questions, the respondent asks that this court affirm the district court in all respects. Thank you. All right. Thank you. You basically ran out of time, Mr. Magruso, but I'll give you one minute if you would like to rebut. Just very briefly, Your Honor. I just suggest as to the reasonableness of strategy and the claim that these are alternate theories, I'd suggest they are not alternate theories. They are consistent theories as to the DNA being present because it was a consensual sexual encounter and that these witnesses will corroborate what happened after the sexual encounter that Mr. Smith testified to at trial. If there's nothing further, thank you very much. Thank you very much. And you were appointed as well, were you not? Yes. So we appreciate your efforts on behalf of your client. Thank you. Thanks to the state as well, and we'll take the case on.